**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STUDENT DOE #1, | ) | |
| STUDENT DOE #2, | ) | |
| STUDENT DOE #3, | ) | |
| STUDENT DOE #4, | ) | |
| STUDENT DOE #5, | ) | |
| STUDENT DOE #6, | ) | |
| STUDENT DOE #7, and | ) | |
| STUDENT DOE #8, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 25 C 4188 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| DONALD J. TRUMP, U.S. DEPARTMENT | ) | |
| OF HOMELAND SECURITY, KRISTI | ) | |
| NOEM, and TODD LYONS, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

In April 2025, the United States Immigration and Customs Enforcement ("ICE"), a

subagency of the United States Department of Homeland Security ("DHS"), abruptly and

without warning terminated the student records of thousands of international students in the

Student and Exchange Visitor Information System ("SEVIS")—including the records of

Plaintiffs Student Does #1–8.[1]  Plaintiffs then sued Defendants President Donald J. Trump, Kristi

Noem, the Secretary of Homeland Security, and Todd Lyons, the Acting Director of ICE, in their

official capacities, and DHS for violating the Administrative Procedure Act ("APA") and the

Fifth Amendment's Due Process Clause, seeking declaratory judgment and immediate injunctive

relief.  On April 21, the Court issued a temporary restraining order ("TRO") directing

Defendants to reinstate Plaintiffs' SEVIS records, retroactive to March 31, 2025, and enjoining

---

[1] For reasons stated on the record, the Court allowed Plaintiffs to proceed by pseudonym, *see* Doc. 17.
Plaintiffs have disclosed their identities under seal.

Defendants from arresting, detaining, or removing Plaintiffs from the United States [18].

Plaintiffs now move for a preliminary injunction [23]. Because Plaintiffs have demonstrated a

likelihood of success on the merits of their APA claim, irreparable harm, and that the balance of

hardships and equities weighs in their favor, the Court grants Plaintiffs' motion and converts the

TRO into a preliminary injunction.

## BACKGROUND

### I.     SEVIS and F-1 Status[2]

The Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(F), permits noncitizens to

enroll in government-approved academic institutions as F-1 nonimmigrant students. *See* 8

C.F.R. § 214.1(a)(2). The Designated School Official ("DSO") at each school sponsoring F-1

students monitors, advises, and oversees the students attending that school. To enter the United

States, an admitted international student must secure an F-1 nonimmigrant visa from the U.S.

Department of State, although the visa does not govern how long an F-1 student may stay in the

country.

When a student enters the United States, DHS grants the student F-1 student status and

permits the student to remain in the United States for the duration of status if the student

continues to comply with the requirements established by the regulations governing the student's

visa classification in 8 C.F.R. § 214.2(f). DHS defines "duration of status" as "the time during

which an F-1 student is pursuing a full course of study at an educational institution certified [ ]

for attendance by foreign students, or engaging in authorized practical training following

completion of studies." 8 C.F.R. § 214.2(f)(5)(i). Authorized practical training includes optional

practical training ("OPT") and curricular practical training ("CPT"). OPT is temporary

---

[2] The Court takes this thorough explanation of SEVIS and F-1 status, with some alterations, from the preliminary injunction order in *Liu v. Noem*, No. 25 C 133, 2025 WL 1233892, at *2–3 (D.N.H. Apr. 29, 2025).

employment that is directly related to an F-1 student's major area of study. U.S. Citizen and

Immigration Services, Optional Practical Training (OPT) for F-1 Students,

https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/optional-

practical-training-opt-for-f-1-students (last visited May 5, 2025). Some F-1 students also may

qualify for a Science, Technology, Engineering, and Mathematics ("STEM") OPT extension. *Id.*

Separately, CPT is alternative work-study, cooperative education, or any other type of required

internship or practicum that sponsoring employers offer through cooperative agreements with

schools. U.S. Citizen and Immigration Services, Policy Manual, Volume 2, Part F, Chapter 5 –

Practical Training, https://www.uscis.gov/policy-manual/volume-2-part-f-chapter-5 (last visited

May 5, 2025).

 ICE, a subagency of DHS, oversees the Student and Exchange Visitor Program

("SEVP"), which maintains records on F-1 students. *See* 8 U.S.C. §§ 1372(a), (c). Specifically,

SEVP administers SEVIS to ensure that government agencies have essential data related to

nonimmigrant students and exchange visitors to preserve national security. *See* Background:

SEVP and SEVIS, U.S. Immigration and Customs Enforcement, https://www.ice.gov/sevis.

SEVIS is a web-based system for maintaining information on nonimmigrant students and

exchange visitors in the United States. *Id.* The regulations require DSOs to report to SEVP

through SEVIS when a student fails to maintain status, which can result in termination of that

student's SEVIS record. *See* 8 C.F.R. § 214.3(g)(2).

 F-1 students fail to maintain status when they do not meet certain regulatory

requirements, such as failing to maintain a full course of study without DSO approval or other

violations set forth in 8 C.F.R. § 214.2(f). Separately, 8 C.F.R. § 214.1 subjects several

nonimmigrant classes, including F-1 students, to requirements for their "maintenance of status."

For example, a "nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status." 8 C.F.R. § 214.1(g).

Further, DHS may terminate a student's F-1 status for the reasons stated in § 214.1(d). That section provides that:

> [w]ithin the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated [1] by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; [2] by the introduction of a private bill to confer permanent resident status on such alien; or, [3] pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.

8 C.F.R. § 214.1(g).

Typically, when F-1 students complete their studies or training, they must leave the United States within a 60-day grace period. 8 C.F.R. § 214.2(f)(5)(iv). And the government gives F-1 students who voluntarily withdraw from classes a 15-day grace period to depart from the United States. *Id.* But an F-1 student who fails to maintain status must leave the country immediately or seek reinstatement, without any grace period for departure. *Id.* ("[A]n F-1 student who fails to maintain a full course of study without the approval of the DSO or otherwise fails to maintain status is not eligible for an additional period for departure."). The United States Citizenship and Immigration Services ("USCIS"), also a subagency of DHS, may consider reinstating a student's status. But the regulations do not require USCIS to reinstate the status of a student who demonstrates, among other things, that they have "not been out of [valid F-1] status for more than 5 months at the time of filing the request for reinstatement" or that "the failure to file within the 5 month period was the result of exceptional circumstances and that the

4

student filed the request for reinstatement as promptly as possible under these exceptional circumstances." 8 C.F.R. § 214.2(f)(16)(i)(A). If USCIS decides against reinstating a student's status, the student may not appeal that decision. 8 C.F.R. § 214.2(f)(16)(ii).

## II.    Doe Plaintiffs

The eight Plaintiffs in this case are international students attending various academic institutions or working under the OPT program across the country. Without advance notice or explanation, ICE abruptly terminated Plaintiffs' SEVIS records between April 4 and April 11, 2025. As a result, Plaintiffs' schools and employers removed them from their programs and jobs. Because neither ICE nor DHS provided any individualized explanation for their decisions, Plaintiffs cannot definitively know the reason behind their terminations. However, Plaintiffs believe ICE may have terminated their SEVIS records for various minor contacts with law or immigration enforcement. Three Plaintiffs think their terminations result from traffic or driving-related conduct (Student Does #1–3), one Plaintiff points to a non-criminal immigration history (Student Doe #4), and the remaining three Plaintiffs suggest minor criminal conduct as the cause (Student Does #6–8). Separately, six Plaintiffs (Student Does #1, 2, 4, 6, 7, and 8) received notification that the State Department revoked their F-1 visas.[3]

### A.    Student Doe #1

Student Doe #1 is a resident of Indiana who completed a master's degree in information science with a 3.83 GPA and was working under the Science, Technology, Engineering, and Mathematics ("STEM") OPT. Recently, USCIS selected him in the H-1B lottery.[4] ICE

---

[3] Plaintiffs do not challenge the revocation of their F-1 visas.

[4] USCIS uses the H-1B visa lottery system to award visas to foreign workers seeking temporary employment in the United States. *See* U.S. Citizenship and Immigration Services, H1-B Specialty Occupations, https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (last visited

terminated his SEVIS record on April 10, 2025. He believes that his termination may result from a 2023 reckless driving charge, where he was driving 70 mph in a 45-mph zone. He resolved this charge by completing a driving safety course and paying a $10 fine. His wife gave birth to their first daughter on April 13, 2025, just days after his SEVIS termination. He now faces unpaid leave and the loss of H-1B eligibility, and he fears detention and family separation. Since ICE terminated his SEVIS record, Student Doe #1 has experienced severe anxiety and distress.

### B.     Student Doe #2

Student Doe #2 is a resident of New York pursuing a master's degree in pure mathematics with a 3.88 GPA. ICE terminated his SEVIS record on April 10, 2025. He believes that his termination relates to a traffic misunderstanding involving a temporary license plate that a judge ultimately dismissed. Since the termination, he has experienced significant distress and financial instability, and his elderly parents have suffered health declines due to stress. Although he was competing for a lucrative summer internship, he can no longer pursue this opportunity and fears derailment of his long-planned path towards a Ph.D.

### C.     Student Doe #3

Student Doe #3 is a resident of Illinois pursuing a master's degree with a 4.0 GPA and working as a research assistant on a federally funded project. He previously earned a bachelor's degree in the United States and completed OPT employment as a utility forester. ICE terminated his SEVIS record on April 10, 2025. He believes that his termination relates to either a dismissed traffic citation or a resolved trespass charge. He was on track to graduate in May 2025 and thereafter begin a Ph.D. program but now has lost his monthly stipend and lives in fear of detention. Since ICE terminated his SEVIS record, he has experienced intense anxiety, financial

May 6, 2025). Because a cap exists that limits the number of foreign workers whom United States employers can hire each year, there is no guarantee that a lottery applicant will receive an H-1B visa. *Id.*

hardship, and emotional distress.  He has borrowed money to cover his basic expenses and legal fees.

### D.     Student Doe #4

Student Doe #4 is a resident of Indiana who completed his academic program with a 3.96 GPA and was working on-campus and planning to apply to OPT positions.  ICE terminated his SEVIS record on April 10, 2025.  He thinks his termination relates to a traffic citation issued shortly after his arrival in the United States that he fully resolved.  Since ICE terminated his SEVIS record, he lost his on-campus job and can no longer apply for OPT positions or maintain volunteer leadership roles.  He also has experienced financial instability, anxiety, and uncertainty about his future in the United States.

### E.     Student Doe #5

Student Doe #5 is a resident of North Carolina who earned a master's degree and was working under STEM OPT in his field.  He recently married his longtime partner.  ICE terminated his SEVIS record on April 4, 2025.  He believes the termination results from a prior airport encounter with immigration officials who informed him that his SEVIS record was inactive upon arrival to the country, although he fully resolved this issue through reinstatement and lawful reentry.  After ICE terminated his SEVIS record, Student Doe #5's employer placed him on unpaid leave, and he fears permanent job loss due to the company's policy prohibiting the rehire of individuals with immigration status issues.  He also has experienced acute emotional distress, sleeplessness, and anxiety as he fears losing his job permanently and forced separation from his spouse.

### F.     Student Doe #6

Student Doe #6 is a resident of Texas who earned a master's degree in advanced data analytics, began working under OPT in 2023, and received a STEM OPT extension in 2024. Recently, USCIS selected him in the 2025 H-1B lottery. ICE terminated his SEVIS record on April 8, 2025. He thinks the termination relates to a 2021 public intoxication citation that a court dismissed in 2022. After ICE terminated his SEVIS record, Student Doe #6's employer placed him on leave. His employer maintains a policy that prohibits rehiring after termination. He has experienced severe emotional distress, including anxiety and physical symptoms of stress.

### G.     Student Doe #7

Student Doe #7 is a resident of Chicago, Illinois who is pursuing a degree and working under curricular practical training ("CPT") authorization as an intern. She also had secured a job offer for this summer. ICE terminated her SEVIS record on April 11, 2025. She believes the termination results from a low-amount retail theft citation that she resolved. Since ICE terminated her SEVIS record, Student Doe #7 has experienced significant emotional distress and physical illness, and she fears having to repeat the academic year, which would create a substantial financial burden.

### H.     Student Doe #8

Student Doe #8 is a resident of Texas who earned a degree and was working under OPT in her field. ICE terminated her SEVIS record on April 4, 2025. Resultingly, she lost her job. She thinks the termination relates to two shoplifting-related arrests, neither of which resulted in convictions. A court dismissed one case, and the other remains unresolved with no formal charges. Since ICE terminated her SEVIS status, Student Doe #8 has experienced severe

emotional distress requiring therapy, and she feels constant anxiety about possible detention and deportation.

## III.    Watson Materials

Attached to their opposition to the preliminary injunction, Defendants provided the Court with a declaration from Andre Watson, the Assistant Director of the National Security Division for Homeland Security Investigations at DHS.  In his declaration, Watson stated that "[t]erminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States."  Doc. 25-1 at 4.  In their reply, Plaintiffs provided the Court with emails and testimony from Watson in a similar case pending before a different district court.  The emails and Watson's testimony support that, pursuant to a "student criminal alien initiative," ICE ran the names of each student in the F-1 program through the National Crime Information Center ("NCIC") database and passed the names of the F-1 students that ICE identified in the NCIC database on to the State Department.  *See* Doc. 28-3 at 6–7.  Watson acknowledged that the NCIC contains not only the names of individuals convicted of crimes, but also individuals who were not convicted of any crime and missing persons.  Watson claimed that his staff of ten to twenty federal employees engaged in a case-by-case review of the F-1 students identified in NCIC.  However, Watson's explanation of the case-by-case review was that in two to three weeks, his team of ten to twenty federal employees ran 1.3 million names through the NCIC system, and then if the name of a F-1 student matched a name in the NCIC, his team would attempt to validate whether the F-1 student was the same individual as the person named in the NCIC system.  Watson next explained that after his team finished this review, they sent the names to the State Department who in turn advised his team whether the F-1 students had valid visas and requested terminating students' SEVIS records.

None of the produced emails suggest that DHS attempted to engage in even a minimally meaningful individual review of each F-1 student to determine whether they were convicted of a crime, much less a crime of violence for which a sentence of more than one year imprisonment may be imposed, before DHS terminated their SEVIS records. In fact, the emails do not name any individual F-1 student or at all indicate any individualized assessment. Rather, these emails demonstrate a shockingly hasty timeline wherein the SEVP division chief decided only fifteen minutes after receiving a list of F-1 students' names to "terminate everyone in SEVIS." Doc. 28-3 at 26

## LEGAL STANDARD

The party seeking a preliminary injunction must show that: "(1) he has some likelihood of success on the merits of his claim; (2) traditional legal remedies are inadequate; and (3) he would suffer irreparable harm without preliminary injunctive relief." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023) (citation omitted). If the movant satisfies these factors, the Court then conducts a balancing test, "weigh[ing] the harm of denying an injunction to the plaintiff against the harm to the defendant of granting one." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) (citation omitted). The Court also considers the "public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (citation omitted). The Court conducts the balancing test using a "sliding scale" where "if the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor." *Life Spine*, 8 F.4th at 539 (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)).

## ANALYSIS

### I.    Mootness

"A case becomes moot when a court can no longer grant any redress for the alleged wrong." *Lauderdale-El v. Ind. Parole Bd.*, 35 F.4th 572, 575 (7th Cir. 2022) (citing *Eichwedel v. Curry*, 700 F.3d 275, 278 (7th Cir. 2012)).  Although Defendants did not raise mootness in their briefing, prompted by certain actions taken by the government after the Court's issuance of the TRO, the parties discussed the issue of mootness at the preliminary injunction hearing. Specifically, on April 25, 2025, in at least one similar case pending before a different court, DHS and ICE filed a notice (the "Notice"), stating that:

> ICE is developing a policy that will provide a framework for SEVIS record terminations.  Until such a policy is issued, the SEVIS records for plaintiff(s) in this case (and other similarly situated plaintiffs) will remain Active or shall be reactivated if not currently active and ICE will not modify the record solely based on the [National Crime Information Center] finding that resulted in the recent SEVIS record termination.  ICE maintains the authority to terminate a SEVIS record for other reasons, such as if the plaintiff fails to maintain his or her nonimmigrant status after the record is reactivated or engages in other unlawful activity that would render him or her removable from the United States under the Immigration and Nationality Act.

Doc. 28-2 at 3.  One day later, on April 26, 2025, SEVP promulgated a "broadcast message" entitled "Policy Regarding Termination of Records" (the "SEVP Policy").  Doc. 28-1 at 2.  The SEVP Policy includes a list of reasons SEVP can terminate SEVIS records, including "Evidence of a Failure to Comply with the Terms of Nonimmigrant Status Exists" or "U.S. Department of State Visa Revocation (Effective Immediately)."  *Id.*  Further, the SEVP Policy states that it is "not a substitute for applicable legal requirements, nor is it itself a rule or final action by SEVP." *Id*. at 3.  The SEVP Policy and Notice raise a question of whether Plaintiffs' claims are now moot.

The Court finds that the Notice and SEVP Policy do not moot this case. By their terms, the Notice and SEVP Policy do not apply to Plaintiffs. The Notice states that ICE will restore SEVIS records and not modify them again until ICE develops a policy on SEVIS record terminations. The next day, SEVP issued the SEVP Policy. Assuming the SEVP Policy is the policy DHS and ICE referenced in the Notice, then any representation by Defendants that they would not terminate students' SEVIS records is no longer in effect. Further, at the time that DHS and ICE filed the Notice, this Court had already issued its TRO, requiring Defendants to restore Plaintiffs' SEVIS records. Moreover, Defendants in this case have not claimed that the Notice or SEVP Policy applies to Plaintiffs or made any representation that in the absence of the Court's order, Defendants would not terminate Plaintiffs' SEVIS records. Finally, even if the Notice applied to Plaintiffs, which neither party claims, some Plaintiffs still report a gap in their SEVIS records from when ICE terminated their records to when the Court's TRO restored them. While the Court accepts Defendants' representations that the gap is inadvertent, the Court believes the gap may result in Plaintiffs' loss of F-1 status or the termination of their SEVIS records in the future. In the absence of this Court's order requiring the retroactive restoration of Plaintiffs' SEVIS records, ICE may view the gap as a period where Plaintiffs failed to maintain proper F-1 status, as evidenced by the language of the SEVP Policy. The Court can redress this outstanding issue.[5] *See Baumgartner v. City of Chicago*, 759 F. Supp. 3d 868, 876 (N.D. Ill. 2024) (finding that a claim for injunctive relief was not moot when the government was "free to

_____

[5] Plaintiffs brought to the Court's attention that some of plaintiffs' SEVIS records reflect a gap between the time ICE terminated their SEVIS records and when this Court issued a TRO requiring Defendants to restore Plaintiffs' SEVIS records. The Court's TRO required Defendants to "fully reinstate Plaintiffs' Student and Exchange Visitor Information System ('SEVIS') records, *retroactive* to March 31, 2025." Doc. 18 at 1 (emphasis added). This Court's preliminary injunction order requires the same. For the sake of clarity, the Court specifies that by retroactive, it means that there should be no gap in Plaintiffs' SEVIS records. Rather, Plaintiffs' SEVIS records should reflect that Plaintiffs were active in SEVIS for the duration of April 2025. Defendants have agreed to remedy the gap and to provide the Court with a status update on its efforts to eliminate the gap in Plaintiffs' SEVIS records no later than May 8, 2025.

return to its old ways" and the plaintiff still maintained "'a legally cognizable interest in the outcome' of the Court's ruling" (citations omitted)).

The Court also notes "the principle that a party should not be able to evade judicial review . . . by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 n.1 (2001). In many ways, Defendants' arguments and actions here have attempted to create a Catch-22[6] situation. Defendants have endeavored to create a scheme where the government (1) revokes a student's F-1 status without meeting the normal requirements for such a revocation, (2) makes it impossible for a student to maintain compliance with their F-1 status such that, even if the SEVIS termination is remedied, the student cannot keep their F-1 status; and (3) insulates its actions from normal legal process and judicial review.

In this attempt, Defendants have ignored the facts and caused tremendous uncertainty for thousands of students lawfully present in the United States. First, Defendants terminated Plaintiffs' SEVIS records and argued such an action is merely clerical and not judicially reviewable. As discussed further below, Defendant's position willfully ignores the reality that SEVIS is not simply a clerical database operating independently of F-1 status. Defendants' argument appears all the more absurd because their own manuals and websites contradict this position. *See* U.S. Dep't of Homeland Sec., *Schools: Maintaining Accurate SEVIS Records–Terminations*, https://studyinthestates.dhs.gov/schools/report/maintaining-accurate-sevis-records

---

[6] "Borrowed from the title of Joseph Heller's classic war novel *Catch-22*, a 'Catch-22' is a problem where the only solution to the problem is denied by a circumstance of the problem." *Sater v. Republic Servs. of Ind. Trans. LLC*, No. 3:23-CV-403-CCB, 2024 WL 4344883, at *5 n.4 (N.D. Ind. Sept. 30, 2024); *see also* Joseph Heller, *Catch–22* 60 (1961). In *Catch-22*, "Yossarian wants to stop serving as a bombardier during World War II. Insanity is a reason for being grounded, and Yossarian tries to convince Doc Daneeka that he is insane—but to ask proves sanity, because an insane person would want to fly more missions." *Davis v. Humphreys*, 747 F.3d 497, 498 (7th Cir. 2014). It follows basic principles of fairness and logic that the Court should avoid placing parties in such a position. *See id.* ("The federal judiciary should avoid using Catch-22.").

(last visited May 5, 2025); U.S. Dep't of Homeland Sec., *SEVIS Help Hub: Terminate a Student–Effects of Termination* (Nov. 7, 2024), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student (last visited May 5, 2025). SEVIS operates as a critical tool for the F-1 status program, enabling students to obtain work authorization, enroll in classes, and otherwise maintain their status.

Next, when courts began issuing orders finding fault with Defendants' actions, ICE then promulgated the Notice and SEVP Policy. Defendants used the Notice to attempt to backtrack on their actions and avoid further negative judicial pronouncements, while making no lasting commitment to refrain from similar behavior or even necessarily remedying some of the issues created by terminating students' SEVIS records. Defendants shortly thereafter issued the SEVP Policy, ostensibly nullifying the Notice and listing reasons SEVP can terminate SEVIS records. However, the SEVP Policy purports to not be a "a rule or final action" such that it could be subject to judicial review. *See* Doc. 28-1 at 3.

Under the language of the SEVP Policy, SEVP can terminate a student's SEVIS record if the State Department revokes their visa, a decision that is generally not subject to judicial review. *See, e.g.*, *Yafai v. Pompeo*, 912 F.3d 1018, 1020 (7th Cir. 2019) ("Congress has delegated the power to determine who may enter the country to the Executive Branch, and courts generally have no authority to second-guess the Executive's decisions."). The State Department has notified six Plaintiffs here that it revoked their F-1 visas. If the SEVP Policy applied to these Plaintiffs, absent the Court's intervention, Defendants could terminate their SEVIS records again and then argue that judicial review of these decisions is inappropriate under the APA due to agency policy. Further, even if the State Department had not revoked many of Plaintiffs' visas, the SEVP Policy says that SEVP can terminate SEVIS records of individuals when evidence

14

exists that they failed to comply with their nonimmigrant status.  Doc. 28-1 at 2.  Because SEVIS

contains the record of an individual's compliance with their nonimmigrant status, Defendants

could use the gap in students' records from when Defendants previously terminated their SEVIS

records, absent retroactive reinstatement, to support further terminations.  The SEVP Policy

makes Defendants' tactics obvious: if the first attempt to take action without being subject to

normal legal constraints and judicial review fails, alter approaches and try again.[7]  For these

reasons, the Court cannot find that the government's use of the Notice and SEVP Policy moots

Plaintiffs' challenges to the termination of their SEVIS records and so proceeds to the merits of

their claims.

## II.    Joinder

Defendants first argue that the Court should deny Plaintiffs' motion for a preliminary

injunction because many of the Plaintiffs are misjoined.  For the Court to properly join plaintiffs

together in one case, plaintiffs' claims must (1) arise out of the same transaction, occurrence, or

series of transactions and occurrences, and (2) contain a common question of law or fact.  Fed.

R. Civ. P. 20(a)(1).  In determining whether plaintiffs' claims arise out of the same transaction or

occurrence, courts generally use a "case-by-case approach."  *Birdo v. Gomez*, 214 F. Supp. 3d

709, 722 (N.D. Ill. 2016) (citation omitted).  Further, "[c]ourts interpret 'transaction or

occurrence' as 'comprehending a series of many occurrences, depending not so much upon the

immediateness of their connection as upon their logical relationship.'"  *Id.* (quoting *Adkins v. Ill.

Bell Tel. Co.*, No. 14-CV-1456, 2015 WL 1508496, at *7 (N.D. Ill. Mar. 24, 2015)).  Courts

---

[7] It appears Defendants take their inspiration from the adage "If at first you don't succeed, try, try again," popularized by William Edward Hickson, *The Singing Master* (1836).  The full lyrics include: "Once or twice though you should fail, if you would at last prevail, try again.  If we strive, 'tis no disgrace though we did not win the race – what should you do in that case? Try again."  *Id.*  While this may make a memorable maxim, it is a poor substitute for the appropriate administration of over a million students simply wanting to study in the United States, who rely upon consistent and readily ascertainable rules governing their ability to study, work, and create lives for themselves in this country.

consider factors such as whether the conduct occurred during the same time period, whether the claims involve the same people and similar conduct, whether the conduct implicates a system of decision-making or policy, and whether trying the cases separately would lead to inconvenience, expense, or delay due to "the likelihood of overlapping proof and duplication in testimony." *Id.* (quoting *McDowell v. Morgan Stanley & Co.*, 645 F. Supp. 2d 690, 694 (N.D. Ill. 2009)).

Here, the Court has discretion and an ample basis to find that joinder of Plaintiffs is proper. *See UWM Student Ass'n v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018) ("These rules are broad, giving district courts considerable flexibility in managing and structuring civil litigation for fair and efficient resolution of complex disputes.").  Plaintiffs attached to their reply a transcript of testimony that Andre Watson, the Deputy Director of Homeland Security, provided in a similar pending case in the District of Columbia, *Patel v. Lyons*, No. 25-cv-1096 (D.D.C. Mar. 30, 2025).  In short, Watson discussed that the termination of students' SEVIS status was part of a coordinated initiative conducted by DHS, ICE, and the State Department; however, government personnel allegedly individually reviewed each student's record.  *See, e.g.*, Doc. 28-3 at 6–7, 10.  Plaintiffs' declarations support that Defendants terminated their SEVIS status at approximately the same time in similar manners.  *See, e.g.*, Doc. 7-1 at 2; Doc. 7-2 at 2; Doc. 7-3 at 2.  Although there may have been some individual determinations regarding each Plaintiff, taken as a whole, the evidence suggests that Defendants' conduct occurred around the same time, in a similar manner, and as part of the same decision or policy.  The Court thus finds that these Plaintiffs' claims are logically related, involving the same or similar legal questions and key facts regarding due process, the APA, and the operation of SEVIS.  Finally, it would be inefficient to require each Plaintiff to file separate cases as their claims will involve significant overlapping proof and duplication in testimony because they each involve factual questions

concerning SEVIS.  In sum, the Court finds that joinder is proper and denies Defendants' request to deny the preliminary injunction on that basis.  *See*, *e.g.*, *Doe 1 v. Bondi*, 25 C 1998, Doc. 43 at 15-16 (N.D. Ga. May 2, 2025).

## III.  Likelihood of Success

To obtain injunctive relief, "a plaintiff must demonstrate that '[her] claim has some likelihood of success on the merits,' not merely a 'better than negligible' chance."  *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018)).  To do so, a plaintiff must make a strong showing of success.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  However, a "strong" showing is not "proof by a preponderance . . . [because] that would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending.  But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case."  *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

### A.  Privacy Act

Before delving into the merits of Plaintiffs' APA claim, the Court must address Defendants' argument that the Privacy Act precludes the APA claim—meaning that Plaintiffs cannot succeed on the merits of their APA claim.  The APA waives sovereign immunity for actions in federal district court by "person[s] suffering legal wrong because of agency action."  5 U.S.C. § 702.  But the "waiver does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).  Defendants contend that the Privacy Act—not the APA—controls agencies' procedures

concerning governmental records.  As a result, Defendants argue that the Privacy Act precludes Plaintiffs' APA claim and waiver does not apply.

Preclusion does not operate here because, as Defendants note, Plaintiffs cannot sue under the Privacy Act because they are nonimmigrant students.  5 U.S.C. § 552a ("[T]he term 'individual' means a citizen of the United States or an alien lawfully admitted for permanent residence"); *see also Doe v. Noem*, No. 25 C 1103, 2025 WL 1134977, at *5 (E.D. Cal. Apr. 17, 2025) (citing 5 U.S.C. § 552a to conclude that "the Privacy Act clearly does not provide plaintiff another adequate remedy, as plaintiff's ability to seek relief under the Privacy Act is not even 'doubtful,' but nonexistent.").  Moreover, Defendants wrongly frame Plaintiffs' claim as one that would fall under the Privacy Act.  The Privacy Act was "passed to protect the privacy of individuals identified in federal information systems" and the Act "addresses the government's retention and disclosure of personal information" while allowing individuals to seek a court order requiring the government to change "inaccurate information" and "correct its records." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024).  But Plaintiffs here do not allege a flaw in their SEVIS records and seek to amend governmental records as allowed by the Privacy Act.  Instead, Plaintiffs' APA claim rests on the premise that their SEVIS status *accurately* reflects that DHS unlawfully terminated their F-1 student status. *See Douglas v. Agric. Stabilization & Conservation Serv.*, 33 F.3d 784, 785 (7th Cir. 1994) ("[T]he Privacy Act does not permit a court to alter documents that accurately reflect an administrative action, no matter how contestable the conclusion may be.").  Plaintiffs challenge Defendants' SEVIS termination determinations and seek to have Defendants reinstate their SEVIS records without gaps in authorized student status, which is relief appropriately sought under the APA. *See id.* ("If an agency errs, the right response is not to rewrite history, changing the record in Orwellian

fashion to pretend that it reached some other conclusion.  The right response to error is to correct the disposition under the Administrative Procedure Act.").  Accordingly, the Court finds the Privacy Act irrelevant here.[8]

### B.    Final Agency Action

A court can only review a "final" agency action under the APA.  5 U.S.C. § 704.  For an agency's action to be "final", the Supreme Court has stated that it must satisfy two conditions: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Here, Defendants challenge both conditions.

Defendants first argue that no final agency action exists because Plaintiffs can administratively challenge DHS's decision to terminate their SEVIS records.  Defendants cite two Seventh Circuit cases to support their assertion, but the Court finds the factual circumstances in both cases distinguishable from the present case.  In *McBrearty v. Perryman*, the plaintiffs brought action seeking review of the decision of the District Director of the Immigration and Naturalization Service's decision denying adjustment of status to that of lawful permanent residents.  212 F.3d 985 (7th Cir. 2000).  The court found the suit premature because the plaintiffs "could obtain review of the district director's decision by the Board of Immigration Appeals if and when the immigration service institutes removal (i.e., deportation) proceedings against them."  *Id.* at 987.  In *Dhakal v. Sessions*, the court found that the Director of the Chicago Asylum Office of USCIS's decision denying the plaintiff's asylum application was not a final

---

[8] Additionally, the Court notes that even if Plaintiffs could bring a claim under the Privacy Act, the Privacy Act does not preclude them from pursuing their APA claim.  *See All. for Retired Ams. v. Bessent*, No. 25-0313, 2025 WL 740401, at *19 (D.D.C. Mar. 7, 2025) ("[T]he availability of a Privacy Act suit for damages does not take this case outside the scope of the waiver of sovereign immunity in § 702 of the APA and does not affect this Court's subject-matter jurisdiction over Plaintiffs' APA claims.").

agency action because once DHS initiated removal proceedings against the plaintiff, an immigration judge would adjudicate his asylum application, after which the plaintiff could appeal any decision to the Board of Immigration Appeals. 895 F.3d 532, 539–40 (7th Cir. 2018). In both cases, robust statutory and regulatory schemes provided the plaintiffs with opportunities to have any officer's original decision reviewed by the Board of Immigration Appeals. *See Dhakal*, 895 F.3d at 539 (concluding that "the executive branch process for review of asylum claims is carefully drafted and detailed . . ." and that "Congress created a systemic scheme for processing asylum claims that was motivated by a desire to revise and regularize the procedures governing the admission of refugees . . . [and] to eliminate the piecemeal approach." (citation omitted) (internal quotation marks omitted)); *McBrearty*, 212 F.3d at 987 (holding the plaintiff's suit premature because the plaintiffs could still seek review under 8 U.S.C. § 1252(a)(1) and 8 C.F.R. §§ 240.15, 245.2(a)(5)(ii), and because Congress passed a door-closing statute to prevent judicial review of any judgment under the relevant statute).

Because Defendants argue that *McBrearty* is controlling, they resultingly assert that Plaintiffs mistakenly rely on the Third Circuit's decision in *Jie Fang v. Director of ICE*, 935 F.3d 172 (3d Cir. 2019) to contend that the termination of a SEVIS record is a final agency action. However, Defendants fail to offer any explanation or analysis to support this assertion beyond stating that "the relevant issue in *Jie Fang* was not a SEVIS record; it was the revocation of lawful immigrant status." Doc. 12 at 10. However, for the reasons discussed above, the Court finds *McBrearty* distinguishable from the present facts, and, for reasons discussed below, Defendants' distinction between a student's SEVIS record and F-1 status is a distinction without a difference.

In fact, the *Jie Fang* court's conclusion is directly applicable to this case. The court determined that "terminating [ ] students' F-1 visas marked the consummation of the agency's decisionmaking process" because "there is no statutory or regulatory requirement that a student seek reinstatement" and "even if the students attempt to pursue the administrative procedures for reinstatement, there is no mechanism to review the propriety of the original termination order." *Jie Fang*, 935 F.3d at 182. Here, Defendants point to no statute or regulation that *requires* Plaintiffs to appeal ICE's SEVIS record termination decision. And even if a student attempts to pursue the administrative procedure for SEVIS reinstatement to which Defendants cite, there is no "mechanism to review the propriety" of the original termination. *Doe v. Noem*, No. 25 C 633, 2025 WL 1141279, at *3 (W.D. Wash. Apr. 17, 2025) (citing, in pertinent part, 8 C.F.R § 214.2(f)(16)(ii) ("The adjudicating officer will update SEVIS to reflect USCIS' decision. If USCIS does not reinstate the student, the student may not appeal the decision.")). "Because neither immigration judges nor the Board of Immigration Appeals (BIA) have the authority to review SEVIS termination or a USCIS denial of reinstatement, there is no proceeding in which a student can contest the agency action at issue here." *Mandan B K v. Kristi Noem*, No. 25 C 419, 2025 WL 1171572, at *6 (W.D. Mich. Apr. 23, 2025). This Court joins other courts to preliminarily conclude that the SEVIS terminations are not merely tentative or interlocutory in nature. *See*, *e.g.*, *Patel v. Bondi*, No. 25 C 101, 2025 WL 1134875, at *2 (W.D. Pa. Apr. 17, 2025) ("The SEVIS termination is a final agency decision susceptible to judicial review."); *Doe*, 2025 WL 1141279, at *3 (reaching the same conclusion for the reasons stated herein); *Hinge v. Lyons*, No. C 25-1097, 2025 WL 1134966, at *1 (D.D.C. Apr. 15, 2025) ("[T]he record at this stage seems to indicate that final agency action has occurred[.]").

Defendants next argue that even if the Court determines that their actions consummate the agency's decision-making process, no legal consequences flow from the termination of Plaintiffs' SEVIS record. Relevant to this argument, Defendants claim that they terminated only Plaintiffs' SEVIS records, not Plaintiffs' F-1 status. Neither party disputes that Defendants terminated Plaintiffs' SEVIS records; but Plaintiffs contend that a SEVIS record termination constitutes a *de facto* F-1 status termination. Defendants disagree. *See* Doc. 25 at 2 ("And the SEVIS record itself does not equate to a determination of whether a foreign student still retains F-1 status."). Although Defendants have argued repeatedly that termination of a student's SEVIS record and F-1 status are separate and distinct occurrences, they have only offered Andre Watson's declaration to support this claim. He states:

> Terminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States. The statute and regulations do not provide SEVP the authority to terminate nonimmigrant status by terminating a SEVIS record, and SEVP has never claimed that it had terminated an alien's nonimmigrant status simply by terminating a SEVIS record.

Doc. 25-1 at 4. Yet the State Department and DHS's own manual and website contradict Mr. Watson's declaration. The State Department's Foreign Affairs Manual ("FAM") states that "the SEVIS record is the definitive record of student or exchange visitor *status* and visa eligibility." 9 FAM 402.5-4(B) (emphasis added). Further, according to DHS's "Study in the States" website, "[o]nce you terminate a student's SEVIS record, the student is no longer in an authorized period of stay in the United States." U.S. Dep't of Homeland Sec., *Schools: Maintaining Accurate SEVIS Records–Terminations*, https://studyinthestates.dhs.gov/schools/report/maintaining-accurate-sevis-records (last visited May 5, 2025). That same website also lists other consequences of SEVIS record termination:

When an F-1/M-1 SEVIS record is terminated, the following happens:
- Student loses all on- and/or off-campus employment authorization.
- Student cannot re-enter the United States on the terminated SEVIS record.
- Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student.
- Any associated F-2 or M-2 dependent records are terminated.[9]

U.S. Dep't of Homeland Sec., *SEVIS Help Hub: Terminate a Student–Effects of Termination* (Nov. 7, 2024), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student (last visited May 5, 2025).  Broadening the last bullet, DHS explains that "[i]n SEVIS, the status of a dependent record follows the status of the F-1 [ ] student," and "[w]hen a dependent is terminated in SEVIS, it means that dependent is no longer eligible for F-2 [ ] status."  U.S. Dep't of Homeland Sec., *SEVIS Help Hub: Terminate or Reactivate a Dependent Record* (March 17, 2023), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/dependents/terminate-or-reactivate-a-dependent-record (last visited May 5, 2025).

Defendants have proclaimed persistently to this Court and courts around the country that the termination of a student's SEVIS record is a simple clerical action that does not also terminate their F-1 status.  But this assertion disregards reality.  When schools or ICE terminate a student's SEVIS record, the student is unauthorized to work, unauthorized to stay in the United States, and loses F-2 status for any dependent.  The Court cannot blindly accept Defendants' current characterization of SEVIS termination and ignore the evidence before it.  The State Department, DHS, and sponsoring schools all follow the agencies' guiding sources and consider

---

[9] F-2 or M-2 dependents are a F-1 or M-1 student's spouse or unmarried children under the age of 21 who may accompany the F-1 or M-1 student to the United States.  *See* U.S. Citizenship and Immigration Services, Policy Manual, Volume 2, Part F, Chapter 9 – Dependents, https://www.uscis.gov/policy-manual/volume-2-part-f-chapter-9 (last visited May 6, 2025).

the termination of a student's SEVIS record equivalent to the termination of that student's F-1

status. The Court moves forward with that same understanding. *See Liu*, 2025 WL 1233892, at

*5–6 ("The evidence in the record at this stage of the litigation leads to only one conclusion.

DHS terminated Liu's F-1 student status when it terminated his record in SEVIS.").

Defendants' termination of Plaintiffs' SEVIS records, therefore, seemingly resulted in a

myriad of significant legal consequences, including the students' loss of employment, inability to

remain in the United States, prohibited reentry into the United States, and the ability of ICE

agents to investigate the student to confirm their departure from this country. At this stage, the

Court therefore finds that Plaintiffs will be able to show that Defendants' termination of

Plaintiffs' SEVIS records, and by effect Plaintiffs' F-1 student status, is a final agency action

because the action is the consummation of the agency's decisionmaking process and one from

which legal consequences will flow. *See Hinge*, 2025 WL 1134966, at *1 (granting the

plaintiff's request for a TRO in part because of "the lack of verifiable information offered by the

defendant rebutting his argument in regards to [ ] the effect of ICE's termination of the plaintiff's

SEVIS record on the plaintiff's lawful nonimmigrant status in the United States" when analyzing

whether a final agency action has occurred).

### C. Arbitrary and Capricious

Pursuant to the APA, a court reviewing an agency's decision "shall . . . hold unlawful and

set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2)(A). An agency's

decision is arbitrary and capricious under the APA when it:

> has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could

24

> not be ascribed to a difference in view or the product of agency
> expertise.

*Awad v. Kerry*, 257 F. Supp. 3d 1016, 1020 (N.D. Ill. 2016) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). "To survive arbitrary and capricious review, an agency action must be the product of a reasoned decisionmaking." *Id.* (quoting *Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012)). This means an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted) (internal quotation marks omitted). A court reviewing an agency's decision "should not attempt itself to make up for . . . deficiencies" in the agency's reasoning and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citation omitted) (internal quotation marks omitted).

Defendants first argue that DHS's termination of Plaintiffs' SEVIS records was not arbitrary and capricious because DHS and schools may terminate students' SEVIS records for numerous reasons not listed in any regulation or statute. In support, Defendants link an ICE website that lists termination reasons available in SEVIS to DSOs. First, the Court notes that the webpage's title only references reasons DSOs—not ICE—may terminate students' SEVIS records. Even assuming ICE may terminate students' SEVIS records for the same listed reasons, Defendants do not direct the Court to any specific reason listed on the page that supports Plaintiffs' terminations.[10] And, from the Court's independent review of the webpage, it does not

---

[10] *See* U.S. Immigration and Customs Enforcement, Student Termination Reasons Available in SEVIS to DSOs, https://www.ice.gov/factsheets/f-and-m-student-record-termination-reasons-sevis (last visited May 6, 2025). Some examples of reasons for SEVIS termination include the student's absence from the country for five months or longer, USCIS approved the student's change of status out of F or M status, death, expulsion, suspension, failure to enroll, and "otherwise failing to maintain status." *Id.*

include the specific reasons for which ICE terminated Plaintiffs' records (traffic or driving-related conduct, non-criminal immigration contact, or minor criminal conduct).

As explained in the background section, Section 214.1(d) allows DHS to terminate a student's F-1 status for three reasons: (1) by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; (2) by the introduction of a private bill to confer permanent resident status on such alien; or, (3) pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons. Defendants contend that, even accepting that ICE's actions terminated Plaintiffs' F-1 student status (rather than just their SEVIS records), the terminations were still not arbitrary and capricious because § 214.1(d) does not indicate that "those three events are the *only* reasons to terminate a nonimmigrant's status." Doc. 12 at 11.[11] Instead, Defendants argue that the regulation provides three baseline reasons for terminating a nonimmigrant's status, but that other legitimate reasons exist elsewhere in the statutes and regulations. However, even if the Court were to accept this argument, the statute and regulation that Defendants cite to support ICE's "other legitimate reasons" to terminate students' SEVIS record or F-1 status do not encompass the reasons for which Defendants' terminated Plaintiffs' SEVIS records here. *See* 8 U.S.C. § 1201(i) (discussing revocation of visas or other documentation by the consular officer or the Secretary of State); 8 C.F.R. § 214.2(f) (describing the circumstances for how a student may fail to maintain their F-1 status).

While students can fail to maintain their F-1 status if they do not comply with certain regulatory requirements under § 214.2(f), Defendants do not argue that Plaintiffs failed to

---

[11] Defendants also argue that 8 C.F.R. § 214.1(d) only regulates ICE's termination of F-1 students' status, not ICE's ability to update F-1 students' SEVIS records. But as discussed above, the Court does not find this argument persuasive because the termination of a student's SEVIS record is equivalent to the termination of that student's F-1 status.

comply with these requirements.[12]  In sum, Defendants do not argue that ICE's terminations or Plaintiffs' conduct fell under one of the three categories of § 214.1(d), nor do they direct the Court to § 214.1(f) or any other relevant authority to justify their actions.  Defendants altogether have failed to suggest any lawful grounds for the termination of Plaintiffs' SEVIS records.

The Court therefore finds that Plaintiffs are likely to succeed on the allegation that Defendants' termination of their SEVIS record is arbitrary and capricious because Defendants have failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle*, 463 U.S. at 43.  *See Liu*, 2025 WL 1233892, at *10 (finding that the plaintiff has shown a likelihood of success on the merits of his APA claim in part because the defendants offered no law or regulation that authorized them to terminate the plaintiff's status).

For these reasons, the Court holds that Plaintiffs have demonstrated a likelihood of success on the merits of their APA claim.[13]

---

[12] The Court notes that 8 C.F.R. § 214.1(e)-(g) lists specific conduct, if committed by any nonimmigrant visa holder, that constitutes a failure to maintain status.  However, Defendants do not suggest Plaintiffs committed any such conduct.

[13] Because the Court finds that Plaintiffs' APA claim has a high likelihood of success on the merits and provides an adequate basis to issue the preliminary injunction, the Court does not address Plaintiffs' due process claim. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA*, Inc., 549 F.3d 1079, 1096 (7th Cir. 2008), *abrogated on other grounds by Nken*, 556 U.S. at 434 ("Because [the plaintiff] surpasses the [likelihood of success on the merits] threshold on at least one of its causes of action, we do not discuss [the plaintiff]'s likelihood of success on its remaining nine claims.").

The Court does note, however, that its analysis of the APA claim does not apply to Defendant Trump, as Defendants argue that Plaintiffs' APA claim against the President is erroneous because the President is not an "agency" under the statute.  The Court agrees and accordingly does not enjoin Defendant Trump. *See Dalton v. Specter*, 511 U.S. 462, 469 (1994) (holding that the President's actions are not reviewable under the APA because the President is not an "agency" within the meaning of the APA but noting that the "President's actions may still be reviewed for constitutionality").  But because the Court does not address the due process claim, and Defendants have not yet filed a motion to dismiss, the Court will not dismiss Defendant Trump at this time.

## IV. Adequacy of Traditional Remedies and Irreparable Harm

The other elements of the preliminary injunction's balancing test are the adequacy of legal remedies and whether the movant would suffer irreparable harm in the absence of an injunction. *Treto*, 82 F.4th 572, 578. In the Seventh Circuit, these elements essentially mirror each other: "[h]arm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc.*, 8 F.4th at 545. Essentially, the analysis looks to whether monetary compensation will make the movant whole. *See Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) ("This takes us to irreparable harm, which we have defined as harm that cannot be repaired and for which money compensation is inadequate." (citation omitted) (internal quotation marks omitted)).

Plaintiffs claim that they have suffered educational, professional, reputational, and personal irreparable harm absent a preliminary injunction. They describe educators and employers who have revoked academic or program enrollment and job or internship offers because of Defendants' actions. For example, some Plaintiffs allege that after Defendants terminated their SEVIS records, their expected graduation and employment is uncertain. *See*, *e.g.*, Doc. 1 ¶ 18 ("As a result [of her SEVIS record termination], [Student Doe #7] is unable to complete her academic program"); Doc. 1 ¶ 66 ("[Student Doe #2 can no longer pursue the internship necessary for advancement in his field, and fears complete derailment of his long-planned path toward a Ph.D."). These are clearly irreparable harms not addressed by money damages. *See Doe v. Middlebury Coll.*, No.15 C 192, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (finding irreparable harm where the plaintiff's job offer was contingent on his successful completion of his degree from his college and "[w]hile Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his

career in July 2016 with this particular employment."); *King v. DePauw Univ.*, No. 14 C 70,

2014 WL 4197507, at *13 (S.D. Ind. Aug.22, 2014) (finding irreparable harm where plaintiff

would "forever have either a gap or a senior-year transfer on his record," noting the inevitability

of questions by future employers or graduate schools for which "any explanation is unlikely to

fully erase the stigma").

 The Court finds that the loss of some Plaintiffs' ability to complete their degrees, coupled

with their and other Plaintiffs' allegations of loss of present and future employment opportunities

and potential removal, place their claims within the realm of irreparable harm with no adequate

remedy at law. *See Isserdasani v. Noem*, No. 25 C 283, 2025 WL 1118626, at *5 (W.D. Wis.

Apr. 15, 2025) ("Given the amount of Isserdasani's educational expenses and potential losses

from having to leave the United States without obtaining his degree, the court concludes that

Isserdasani credibly demonstrates that he faces irreparable harm for which he has no adequate

remedy at law in the absence of injunctive relief."); *Oruganti v. Noem*, No. 25 C 409, 2025 WL

1144560, at *5 (S.D. Ohio Apr. 18, 2025) (citing *Isserdasani* and four other similar cases finding

irreparable harm and granting TROs); *Doe*, 2025 WL 1141279, at *8 ("[I]n this case, the

ordinary harms of removal would compound the other harms Plaintiff faces by effectively

eliminating his ability to complete his degree program, causing him economic and reputational

loss wherever he ultimately resides.").

## V. Balance of Harms and Equities

 Because the Court has found that Plaintiffs have met the threshold requirements, the

Court now "weigh[s] the harm the denial of the preliminary injunction would cause the

plaintiff[s] against the harm to the defendant[s] if the [C]ourt were to grant it." *Mays*, 974 F.3d

at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff

is to win on the merits, the less the balance of harms needs to weigh in [her] favor, and vice versa." *Id.* Here, Plaintiffs have shown significant harms that they will suffer absent a preliminary injunction, including loss of access to education, employment opportunities, and lawful status. Defendants argue that a preliminary injunction will harm DHS's authority to enforce a statute that directs the agency to collect information relating to the nonimmigrant foreign students. *See* 8 U.S.C. § 1372. The Court fails to see how a preliminary injunction would interfere with this data collection ability, and Defendants do not further explain this argument. Accordingly, Defendants have demonstrated no harm.

"When the government is a party, the balance of equities and the public interest factors merge." *Nken*, 556 U.S. at 435. And "the public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos Council, Inc. v Kempthorne*, No. CV 06-745, 2006 WL 8443876, *5 (D.N.M. Sept. 15, 2006) ("It is in the public interest that federal agencies comply with their own policies and with federal statutes."). Here, Defendants argue that the public interest factors favor them because "the public interest in enforcement of immigration laws is significant." Doc. 12 at 14. Yet, as discussed above, Defendants have failed to show thus far that their decision-making complied with any immigration law or regulation. The balances of equities, therefore, favors Plaintiffs' interest in the government's compliance with its own laws and regulations.

## VI. Bond

Rule 65(c) provides that, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained." Fed. R. Civ. P. 65(c). However, "the case law has somewhat weakened the force of the 'no order shall issue' language" in Rule 65(c). *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980); *see also Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 700 (7th Cir. 1977) ("Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)"); *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (the district court retains discretion to determine if a bond must be posted despite the mandatory language in Rule 65(c)).

Defendants request that Plaintiffs post a security bond, though the only reason they assert in favor of this request is that "[t]he risk of harm to [D]efendants here is not insubstantial." Doc. 25 at 11. Defendants offer no support for this statement, nor do they suggest a bond amount. In fact, the record does not indicate that Defendants will suffer any monetary damages due to the preliminary injunction. Having considered the facts and circumstances of this case, the Court follows the decision of other courts and declines in its discretion to require Plaintiffs to post a bond for the preliminary injunction. *See*, *e.g.*, *Rodriguez v. Noem*, No. 25 C 616, 2025 WL 1284722, at *12 (D. Conn. May 1, 2025) (waiving Rule 65(c)'s bond requirement because the plaintiff "brings strong claims against Defendants and the likelihood of harm to Defendants is almost nonexistent.").

**CONCLUSION**

For the foregoing reasons, the Court grants Plaintiffs' motion for a preliminary injunction

[23]. The Court converts its previously issued TRO [18] into a preliminary injunction.[14]

Dated: May 8, 2025

_____
SARA L. ELLIS
United States District Judge

---

[14] For the reasons stated earlier in this Opinion, the preliminary injunction does not apply to Defendant
Trump.